May it please the Court, Scott Hunt appearing on behalf of Plaintiff of Helen Carl Ransom. As the Court knows, this case involves two primary issues, whether my client's multiple, distinct, different complaints to different members of defendants' management at different times can support both a retaliation claim under the OR-OSHA statutory protection for reporting a workplace safety violation, as well as a separate wrongful discharge claim under the common law for opposing a public health risk. And the key in that analysis is to recognize the different complaints that my client made. The lower court erred by making it one homogenous, single complaint and recognizing that there is a complaint of workers' safety regarding the disturbance of asbestos in the portion of the hospital being remodeled, and then assumes that because that's part of this, in the Court's view, homogenous complaint, that that preempts any other aspect or any other claim based on other aspects of the complaint. Here, the evidence isn't of a homogenous complaint. Here the evidence is that in the upper, in the second floor where the remodeling was being done, my client observes what he believes to be illegal disturbance of asbestos by the laborers. He reports that immediately to a lead, Doug Michel. Johnson and Gray aren't there. Is there a disagreement about whether he was really the precipitating factor or whether other people were the first? Apparently, from defendants' point of view, there is a disagreement. They argue that Ellis is the precipitating factor. Our evidence is that Mr. Ransom went to Doug Michel and observes Doug Michel talking to Johnson outside of the building and that Johnson then comes to the second floor where the asbestos has been disturbed. So there's the initial complaint to Doug Michel. Johnson comes and there is, both reported by Ransom's testimony and Johnson's testimony, three distinct complaints made in the work area itself. Those complaints are about the health and risk to himself and his coworkers. Complaint number one, covered under 654-062. The second complaint Mr. Ransom makes is about the risk posed to the babies in the ward above them. Again, it's critical to recognize that the hospital is being remodeled and operating at the same time. The wing that is being remodeled where the asbestos is disturbed is partitioned off, and the rest of the hospital that is operating includes the baby ward directly above the work area. Mr. Ransom's complaint as directed to the risk to the baby ward and the babies and mothers in that section involves the tracking from the work area into the public operating hospital. That's a different complaint. Yeah, I guess, can you help me? We're talking about Oregon law, aren't we? Yes. Solely, okay. Solely on both claims. Yeah. Now, Oregon, to protect employees who complain about conditions in the workplace, Oregon has an established set of remedies, is that correct? Under the Oregon, it's referred to as OR-OSHA, the Oregon equivalent to OSHA. Oregon, the state, little OSHA, okay. Right, little OSHA. And are those administrative remedies? It is. It allows for the back pay and reinstatement. It's not the full panoply of remedy. But is that by an administrative agency? I'm sorry. It can be pursued through the Bureau of Labor and Industry. You can also receive a right to sue and pursue through the law. And from whence do you derive the notion that it's only back paying? It says something like all appropriate remedies, so how do we know it's only back paying? That language has been interpreted in other cases to be referring to equitable relief, not compensatory relief. Because the employment discrimination remedy specifically says only equitable relief, and this one's for it differently. Yes. Well, the lower court found in this case that it's limited to equitable relief, that there is no compensatory relief. Oh, but they could be wrong. I mean, I'm asking you how do we know that. Well, certainly they could, yes, obviously. Is Oregon law saying that? There's a definite difference between the two statutes. I do not know of a case directly on point in interpreting the full breadth of remedy available under 654-062. I believe that's the answer to your question. But I think that kind of begs the question as to whether it fits under Holeen or not. I was sort of interested in the fact that after Walsh, and it wouldn't be entirely clear to me that Walsh is even still good law except for this difference, because there are all the later cases about discrimination cases, which apply what seems to be a different test than Walsh. I agree. If it's not for these two, this distinction, then I don't know whether Walsh persists. But this distinction may explain it. I don't believe Walsh is consistent with Holeen. I don't believe Walsh takes a position that there are adequate remedies here, but there's only equitable relief at the time in Walsh. Holeen looks at 659-030, which provides. But how do you know there's only equitable relief? You say that there, too, and that statute also said all appropriate relief. That was the Federal statute. So why do you keep saying there's only equitable relief? I think it's similar to, unless there's a part of the statute that I'm missing, I think it's similar to the language in 659-030, which Holeen looks at. Well, I could be wrong, too, but I think that there is this one distinction, which is that one says specifically equitable relief and restatement, and the other says all appropriate relief. We can both check that, but that's my understanding. Right. Because I was trying to figure out why is Walsh still around, and that's what seemed to me to be the reason. And I think that's the only way to make Walsh consistent with the rest of the rulings, is that Walsh must assume that there is a full panoply of remedies, because otherwise it's not consistent with Holeen. Holeen looks at 659-030 and says there isn't a full panoply. It doesn't address the personal nature of this wrong, and therefore in resisting sexual harassment you do have the common law claim. I think the question you raised begs the question as to what is a proper standard of what is preemption as to a wrongful discharge claim in Oregon. The defendant in the lower court relied on Draper, which I think presents it as either method. It can be an adequate remedy as determined by the court, or it can be a legislative intent to preempt the law. And I think Holeen and Schottky say that actually the Walsh analysis of there being an adequate remedy really is determined by looking at the legislative intent. And so I think whereas Draper presents it as there are two tests, I think the proper analysis is presented by Holeen and Schottky, and that is that you determine if the ---- There were several cases afterwards which were not directly on point, but they were pretty close in terms of the ---- and somewhat analytically different, if my distinction doesn't hold up. So what do we do as a federal court at that point? Do we follow the older case because it's ---- Well, I don't think actually this case fits into Walsh. I don't believe ---- I don't believe in this particular case the court has to determine whether Walsh is still good law or not because factually we have the distinctive complaints. Factually, it's not a single complaint where you have to determine whether that complaint has an adequate remedy under 654 or not. In this case, there are distinctly different complaints made at different times to different members of management regarding different qualities of the wrong for the conduct. Now, the wrong is the same. No, I don't believe it is. The wrong stems from the same conduct or stems from the same act, the disturbing of this asbestos. But the wrong isn't the same. The illegal aspect of it is the second claim before the court, whether or not he reported criminal activity. The illegal aspect of it is are the laborers in disturbing this asbestos committing improper abatement? Okay, so that's the focus on that one is what are the laborers doing with this asbestos? The 654 claim is based on complaints to Johnson both in the work area and outside when they're milling around. Hey, the presence of this asbestos, it being disturbed, the presence of it. I'm sorry. If they aren't, if they're creating a problem with asbestos, I don't see that there are two different wrongs. Well, there's. It's the same situation on the work site. As to those two claims, it is. As to the third claim regarding the situation outside of the workplace, in the operating portion of the hospital posed to the public, created by the same thing. Well, but being not, no, not. It's critical, I think, that you recognize that the nature of the complaint is people are tracking it from the work area into the public area. So the basis of the public complaint isn't simply, oh, we have asbestos in the work area, portioned off from the public and isolated and posing no harm to them. It's a separate complaint. Not only do we have asbestos in the work area posing risk to myself and my coworkers, but we also have that being tracked through the operating portion of the hospital into the floor above us and exposing the babies in that ward to that risk. So there is an additional quality to the complaint that the wrongful discharge claim is based upon. We don't have to, in this case, address what I think is a legitimate concern regarding some other cases that you hear this week, as to whether Walsh is good law or not. This case is a separate complaint not covered under Walsh. It is not the type of complaint where you look at a single complaint. Is that complaint involved workplace safety and potentially other issues? It's not that complaint. There is that complaint present, but there is a separate distinct complaint. It's wrongful public policy. In other words, what I'm asking is this. Let's assume that he complained about, that he did separately or additionally complain about the effect on the babies of the asbestos. There is, is any complaint about something that might hurt somebody protected by the Argonne Wrongful Discharge Law? Conceivably, no. But in a case where you have laws, you can look to Bonitas, the Bonitas case, and you look to whether there are statutes, common law, regulations that indicate an important public policy. And here we have the environmental laws that regulate asbestos, that talk about pollution through asbestos, that exist to protect public safety, and that create a criminal nature to, or create a criminal penalty for violating those laws. But that's a separate point, right? Because you're not relying on the criminal penalty for present purposes. For this issue. For this issue. You're relying on it for the other issue. We're relying upon that for the reporting criminal activity, but all of those laws and statutes under the Bonitas case, you look to all of those statutes to determine whether there's a public policy involved. Let me make sure that I understand, because I'm really having a little trouble. If you have a situation on the work site where there's a violation of OSHA in connection with the dealing with asbestos. It happens on the work site, there's no question. If the employee says, and is not hired back or whatever happened to your client, that there's a safety violation, that you're not dealing correctly with this asbestos, then, and I'm worried about my safety and the safety of other workers, then there are clear statutory remedies. Right. But if that employee happens to say, and besides, it's going out on the street and people passing by are in danger, too, then you have a whole tort lawsuit for wrongful discharge that's completely different on a different track. That's the distinction? That is the distinction. Does that make sense? Well, it makes sense because look at it in the reverse. If my client only complained about, hey, the asbestos is being tracked into a non-work area that endangers the public and never expresses any concern about workplace safety, I would be arguing before the court because my workplace safety claim had been dismissed. If there was no implication of workplace safety, I wouldn't have the 654-based claim. So the question, it kind of goes to the Butler case. What happened here? He did, in fact, file an OSHA claim, and what happened? On the discharge, didn't he? No, he did not. I'm sorry. Excuse me. I misspoke. I misunderstood the question. Yes, he did. There was a third claim that we did have for the OSHA violation, exactly, for one of the three types of complaints. And he did file a complaint with Oregon OSHA also? He did. He called OSHA and complained after the termination. Right. Okay. And I'm running out of time, so I briefly want to address the reporting criminal activity case. The court got that wrong in that my client wasn't simply discussing the disturbance of asbestos with witnesses. First of all, they weren't witnesses to it. The evidence is that they were not present when the asbestos was disturbed. Second of all, even if they were witnesses, by labeling it illegal, that is material difference than simply discussing the fact, oh, look what they did, this is how they did it, and discussing the conduct itself. Labeling it illegal makes it a report of criminal activity. And the Judge Brown in the lower court in the case cited in our materials got it right, as did the Bureau of Labor and Industry, that a report to any person, thus including the employee supervisor, constitutes a report. Defendant relies upon those BOLI regulations to argue report and oppose are different. But those same BOLI regulations state that report can be to anyone. I will reserve the rest of my time for rebuttal. Thank you. You have about two minutes. Good morning, Your Honors. My name is Andrew Roushel. I represent HBE Corp. in this matter. Unlike someone who spoke earlier, this may get into some interesting legal arguments, at least about Oregon law. Let me begin by saying on the first claim, the wrongful discharge claim, Walsh does govern this case. And let me step back and say, the more you look at Oregon law on wrongful discharge, the more confused you're going to be. It is a mess. And I think the courts have been dishonest in trying to pretend that it makes sense. It doesn't. But the nice thing about this case is we do have a case on point, and it is still good law, and it is Walsh. I know one of you expressed concerns about the adequate remedy and the adequate relief. Let me say this. Under Oregon law, it's not enough just to look at what is the remedy. The tort of wrongful discharge is a gap filler. It's there for an at-will employee. When an at-will employee gets terminated, in Oregon, like any other at-will state, it doesn't matter whether it's good reason, bad reason, or any reason. The court stepped in and said, wait a minute. But what is the difference between this cause of action, Walsh, and the discrimination cases? Other than that there's a discrimination case. It has to do with, I guess, the public interest, which is where I was going. Because in Oregon, and this point is made in Holeen and appellate courts afterwards, if you sue because you're discriminated, if you're fired because you're a woman, you can't sue under the tort of wrongful discharge, because it is believed that the remedies under Title VII in Oregon equivalent, those equitable only remedies, are sufficient to protect the public's interest against discrimination. However, if you are fired for resisting discrimination, for saying, hey, you're treating me badly because I'm a woman. Or, hey, stop sexual harassing me. It has to do with how the state, as said by the Supreme Court, values certain public interests. Resisting discrimination appears to be more important to them than discrimination itself. I'm not saying it makes sense. What the cases say is that they are looking at the intent of the legislature, and they're looking at whether they, and a big piece of that is whether there's a full panoply of remedies or less than a full panoply of remedies. Yes, but how much, it doesn't, the cases never say you must have the full panoply. It just says it has to be adequate to protect the public's interest. In some cases, apparently you need the full panoply, and in some cases you don't. Do you agree that the civil cause of action for retaliation under Oregon OSHA is only for retaliation, is only for back pay and restating? Yes. That was what we argued to the, and successfully argued to the district court below. All right. So if that's true, then I can't see the distinction with the discrimination cases. And I think it's the same thing as why Holeen says it's okay to discriminate against someone and you don't have the tort, but it's not okay to resist discrimination and you have the tort. It has to do with weighing the public interest. And, again, this is the whole point of the tort in the first place is a gap filler. Some things are so repulsive to the public that we have to allow them to be remedies. And you're basically saying the discrimination case is a discrimination case. I mean, that's the bottom line, that that analysis is only in Oregon. At least in Oregon. The Supreme Court, and I don't see anything that says Walsh is a good law. It's still, if anything, that there's two Oregon Supreme Courts from 2002, two decisions on wrongful discharge, both of which are reversing appellate courts and narrowing the tort. One of which is relevant to this case. It's the Dinock decision, which was actually decided less than a week before we filed our briefs. And what that essentially says is we don't have a public policy here anyway. This was not fleshed out in our brief because the decision kind of came down kind of contemporaneously with our filing. But what that says is that case involved a security guard, private security guard, who arrested some people at a concert and then the security guard was fired. And they said, well, we were fired in violation of Oregon public policy. Oregon law says that, you know, it's important to keep the peace. And Oregon law even authorizes citizen's arrest. And the court, the Supreme Court said no. There's no law that gives you an affirmative duty to do this. It's different than the Nease case, Nease v. Hawks, which created the tort, which was the right to be on a jury. The Oregon Supreme Court said no. Unless there's something that expressly says you have the affirmative duty to do it, exercising a right which we think is good isn't a public policy. And what we have here plaintiff points to the OSHA regulations. All right. Not even the OSHA regulations. The environmental protection regulations would say, look, we should have clean air. That's true. But there's no affirmative duty to report that. But there's no affirmative duty to report that you were discriminated against. But we know that there's a common law tort. There's two ways to get the tort under Oregon. And this is critical. So I apologize for not making this clear. There's two ways to reach the wrongful discharge tort. You can have a, you can be exercising a public duty or societal obligation, or you can be exercising an employment-related right that is also of a public importance. First, this case from plaintiff's briefing is the first one. The second case, just to touch, to make the point, employment-related right that's also of importance to the public, that's the second Supreme Court case that came out in 2002. That is the, I apologize, that's the Dymock case. The case I was discussing before about the security guard is Bonick. Let me ask this question. Suppose that that Ransom had been just concerned about this asbestos getting into the hospital with the babies and so forth, was not concerned about the threat to the workers. Could he have filed under 654-062? Could he have filed under 654-062? Yes. And that is actually the case plaintiff tries to rely on, the Butler decision. The Butler decision was, involved a Orosha 0654.062 case and a public whistleblower case. The employee there was for the public employer. Didn't have wrongful discharge at all, which is why it's really not relevant to the point he's making. But it involves those two statutory claims. And what happened on the Orosha case is the court said, wait a minute, you didn't actually complain about something that the, in that case it was the prison board, has jurisdiction over. There is no safety rule about what you're complaining about, overcrowding in the prisons. So we don't even have to touch your case. The court reverses saying, no, that's wrong. It's relate to. Anything that relates to a safety issue. It doesn't actually have to be one that's governed. If it's close enough, we're going to put it under the ORS 654-062 or Orosha retaliation. What's peculiar about this is that this is really a workplace statute. That's just to guarantee the as much as possible the safety of the workers. It has nothing to do with with the societal problem of protecting, say, like the babies or other patients in the hospital. So it seems strange to me that you could you could bring an action under the 654-062. Well, but it gets back to the incident that we're dealing about is workers allegedly and ultimately they were cleared. There was no asbestos exposure, but workers allegedly exposing or damaging asbestos pipe. That was that one incident is this whole thing happened in about a half an hour. There was a concern. It was reasonable at the time. And yes, at one moment they were concerned for their safety. At the next moment, they're allegedly concerned for other people's safety. But it all comes down to one incident. I think it's I don't think it's fair to say that workplace safety rules are not intended to protect the public at large. I mean, some are going to be asbestos is going to be for both. I can use some of my time to also discuss the other issue. Unless you have. Could I just get the procedural background of this? One of these decisions is the magistrate. This was originally the tribunal magistrate. Is that right? Yeah. In Oregon, all the cases get assigned randomly to one or the other. If both parties don't consent, which was the case here, the magistrate's opinion can be objected to. It was Judge King in Article Three that adopted the findings of Magistrate Etchmaskis. Okay. And I think that's included in the excerpts of records that plaintiffs filed. He just simply says, I think I find Judge Etchmaskis has got it right. This case was filed in federal court or state court? Federal court, I believe. All right. Go ahead. We'll talk about the other issue. The other issue is, to me, again, admittedly, it's an area where Oregon law hasn't really weighed in much, if at all. But it's one that comes down to common sense. And while we argued, and I'm not conceding that this position is wrong, we certainly took the position that a report to kind of trigger the protection of the whistleblower statute  The district court relied on, and I guess I want to focus on, a different reason. They didn't go there, and this court doesn't need to go there. They just simply sort of said, common sense says what happened in this incident isn't a report. And I liken it to this hypothetical, I guess. Two people are walking around the corner, and they come upon a mugging. And one turns to the other and says, oh, my God, there's a mugging. And the other says, you're right. Later, one of them, they both work for the same employer. Later, one of them is sharing with their boss, wow, Tim and I came upon a mugging, and Tim gets fired. The plaintiff argues talking to anyone is whistleblowing. The fact that he turned to the person witnessing the mugging with him and said, wow, that's a mugging, this is terrible. Is that the argument, or is that talking to Gray, who I guess wasn't there at the time? I think that is the argument, because the facts, as you go through them, are undisputed that he never mentioned criminal activity to Gray. The only thing plaintiff claims he mentioned to Gray, and he says it about four occasions. It wasn't right. It wasn't right. I didn't know. Actually, it's more specific. It's focusing. It's really that I didn't know there was asbestos on the work site. So who does he say that he said that it was illegal? He says it to another carpenter, Johnson. Johnson. He says in front of Johnson and others this. What happens is this. And I draw your attention to ER 21, page 10 and 11, because I think this is critical. What happens is he says, he goes up to Doug, and he says, hey, this isn't right, that kind of stuff. And his testimony is Doug asks them, is this your opinion or is this everyone's? And he says, everyone's. And Doug says, how do you know? Or, no, he says, yes, absolutely. So in deposition, he's asked, how do you know it was everybody's opinion? And he goes on to testify. And, again, it says ER 10 and 11. Greg Ellis was running around the place screaming loudly. So was another carpenter. I couldn't, I can't remember his name. I'm sorry, ER 10 and 11? I'm sorry, ER 21. And it's on that page is several pages of deposition. Oh, I see. And it's plaintiff's depositions 10 and 11 is where this kind of dialogue happens. But this is, the key is, this is all before he goes to Doug. He admits he heard Greg Ellis running around. Doug. Who's Doug? Doug's just another carpenter. He refers to him as a lead. Whether he's a lead or not is in dispute. So I guess for the purposes of here, we could say he's a lead. But he goes to another carpenter, Doug. So he's telling Doug, I know this is what everybody's thinking. Doug. Doug then goes to Joe. And ultimately they leave. Then after, somewhere after that they all leave. Joe testifies he doesn't even recall Doug coming to him. He remembers Greg. But the bottom line is they all leave. There's about 10 to 15 carpenters out there. And then on ER 22, at depositions page 14 to 15, plaintiff testifies, we're all outside and, quote, everyone is talking about how this is B.S. and this is terrible. And there's kind of everyone's out there complaining. That's where Johnson hears. And that's where Joey Johnson hears Carl Ransom complain. That's where maybe Bruce Gray might have overheard something more than the comments about I can't believe, I didn't know there was asbestos on the worksite. And that's the point about this isn't a report. That's why this is like my hypo. This is a bunch of people who got excited in the moment, all went out. They're all milling about. They're talking about, wow, I can't believe this. This seems terrible. Whoa, how could this happen to us? What might happen to other people around it? And he is just one of many. And we also point out he's not even, you know, as far as Bruce Gray, the ultimate decision maker, Joey Johnson is the only one who speaks to him directly. And he's in his face about it. Greg Ellis, he learns, and Bruce Gray testifies, Greg Ellis actually went through the hospital screaming, get out, get out, get out. You're being exposed to asbestos. And that came to Bruce Gray, and he knew that. There's nothing that singles Carl out, Carl Ransom, the plaintiff out, other than, you know, he himself understandably was concerned and caught up in the moment. And I think at one point he even testifies, and I'll have the slide. Yeah, on ER 32, also at his deposition on page 22, he actually testifies. He says, I don't know what anyone else was doing. I was too consumed in my own feelings. So it's his position that when he spoke to Doug, he was in fact going up the ladder because Doug was. I do think that is what he believes he was doing. He wasn't, and there's nothing to suggest that he was or that, you know, and again, I guess even if he was, quote, unquote, going up the ladder, I still think, you know, they were all in this room that was smaller than this courtroom. And the carpenters were at one end, and the laborers are demolishing what was a janitorial closet at the other end. And everyone's kind of, you know, part of this kind of frenzy at once. So what happens is a wall falls, and dust poofs up, and, you know, is it drywall or is it asbestos? And that's kind of the ultimate scare because there's just suddenly kind of dust from a wall collapsing, and ultimately everyone says, let's get out of here. So that's what's going on there. And I do think it is critical that the statutes, not Bowley, but the statutes uses the word, the Oregon whistleblower statute uses the word report. You must report criminal activity. That is distinct from the anti-retaliation provisions in the OROSHA, in the discrimination contents, all of which use the phrase oppose, and which Bowley has, and understandably. Are you contending that you have to report to the appropriate state agency? We do contend that, but I don't think you need to find that to rule in our favor in this case. Why isn't there a question of fact as to the actual reporting within the chain of command to what was actually said was illegal and who said it? Why isn't that a question of fact? Because it's 100% clear that nothing was reported to the person who terminated him. And that there is no way the person who terminated him, Bruce Gray, had any knowledge of his concerns or reports. So ultimately, if the report ---- Is that true or of this particular report? What I mean to say is this. The person who terminated him did know that he was upset and somewhat a leader of the ---- I'm sorry. Did know that he was upset about it and somewhat a leader of the protest to him. No. Well, maybe that he got upset, yes, that he was a leader of the protest, no. But not necessarily that he said it was illegal. For this purpose, that's all you have to tell me. All we know, all that Bruce Gray knows is he was one of about 10 to 12 people who left the site, and that a plaintiff's testimony is that he heard me say, I can't believe you didn't tell me there wasn't asbestos on this site. That's the only thing in the record that Bruce Gray knows about Paul Ransom's involvement in whatever you want to call this incident. I guess there would be an inference, though, that more than that had been relayed to Bruce Gray from others who had said that Ransom was upset about all this because it was illegal and it was a danger to the workers. The undisputed testimony of everybody was that they did not relay anything to Bruce Gray about Carl Ransom. Joey Johnson testified that. I think there was ---- Well, I know Joey Johnson testified that. Bruce Gray testified he did not hear from anybody about that. And there was nothing other than plaintiff speculation to suggest otherwise. And just like in 1938 ---- Well, Joey Johnson was almost fired, too, wasn't he? Yes. Over this. I don't believe it was over this. I don't think there's any ---- He was fired about staffing issues, or almost fired about staffing issues and time. But Joey Johnson, it's my understanding, that supported Ransom's complaints. He supported his ---- He supported not only Carl's complaints, he supported everyone's concern that there was potential expestive exposure. He also, for the record, was against the hiring of Carl Ransom, believing that an extra carpenter was not needed, which was ultimately the reason Carl Ransom was let go. There was kind of some power plays between Bruce Gray and Joey Johnson from the group. It's hard for me to understand that that isn't a question of fact, that they were behind schedule, they hired more carpenters after Ransom was not ---- Retained. But ultimately, before you even get to those questions of fact, the answer to the question is, is there a legal claim here? Was there a report of criminal activity that would open the door? If that door is open, we've argued that there's no question of fact, but admittedly that's a harder argument to ---- What exactly would you say, leaving aside the question, the theory that no report that isn't to an outsider counts, what is a report? You've got to, I guess, almost go back to the district court case that plaintiff likes to rely on. You've got to take affirmative steps to blow the whistle. You've got to be a rat, if you will. You know, if you're not willing to stick your neck out and be the rat, then you shouldn't be protected. And what you have in the other ---- As I understand it was, I went to Doug Murrell, who was my superior, and said something that nobody else was saying, which is that this was not simply a bad thing, but it was illegal. And I expected that to change the dynamic. And he might argue, and it did. Go back and, I guess, look at the depositions I sent. Other people were running around screaming the same thing. So it was sort of, there was part, there was an event going on here. The district court case, the Judge Brown decision plaintiff cites, the distinction is this. That case, someone ratted out their supervisor. They wrote a letter to their supervisor's supervisor saying, this person is doing these terrible things. They put their neck on the line. They went out. They affirmatively got into the person. I think what you have here is more kind of a panic. There's an incident of panic. And I don't think that kind of applies. Okay. Thank you. The number of complaints made to Johnson and Gray and Doug Michelle is the lead in question. And, yes, he starts with the lead. He's the one present, and he works up the chain of command. The citations at ER 21 and 22 are plaintiff laying out his complaints to Mr. Johnson. What do you mean he worked up the chain of command? The only one to whom he affirmatively said it was illegal was Doug. No. No. The defendant got it wrong. Look at ER 21, 22, ER 80 and 84. Johnson at ER 80 and 84 lays out three specific distinct complaints one is about. And each one of those contains a complaint about it being illegal. Up in the second floor, before they go out at ER 80, and once they're outside at ER 84, he also repeats that it's illegal. To Gray, he says that what to Gray at ER 24 and 25, he says, I'm not happy working around asbestos. It's not right what they are doing. Gray's response is, does anyone else have a problem with that? And the testimony is, nobody else responds. Ellis says that plaintiff then says, well, maybe we ought to get somebody else involved. And Gray's response is, I don't understand. You guys have been working around this for two years, and nobody's ever had a problem with it. My guy's been hired four days earlier. There's enough evidence there that Gray knows, and this is the first time the issue of asbestos has led to a walkout. There's enough evidence there for a jury to decide whether Gray blames my client for the various reports he's made to Michelle, Johnson, and himself. Can I just ask you what I think Judge Berzai asked you quite a while ago? What actually happened with respect to the OSHA complaint that was made? It was investigated, and he tried to make the complaint on Friday, the day of the incident. He got home too late to contact OSHA. He goes in and is terminated Monday. Afterward, he does file a complaint indicating his good-faith belief in the illegal activity. And that is investigated and is not found to be a violation. And that's not disputed? That aspect is not disputed. Okay. Thank you. Time has expired. The case just argued is submitted for decision.
judges: Schroeder, Hug, Berzon